28

THE PEOPLE *ex rel.* The Town of Cicero *et al.* Petitioners, *vs.* ROBERT M. SWEITZER, County Clerk, *et al.* Respondents.

*Opinion filed January 29, 1930—Rehearing denied April 4, 1930.*

EDWARD J. CARMODY, JACOB E. DITTUS, JOHN J. SHERLOCK, and FRANK POSVIC, (ODE L. RANKIN, of counsel,) for petitioners.

HAYDEN N. BELL, ROY MASSENA, and CHARLES C. CARNAHAN, for respondents.

OSCAR E. CARLSTROM, Attorney General, and MONTGOMERY S. WINNING, for the Tax Commission.

LESTER L. FALK, (SCOTT, BANCROFT, MARTIN & MAC-LEISH, of counsel,) *amicus curiæ.*

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Pursuant to leave granted, there was filed in this court an original petition in the name of the People of the State on the relation of the town of Cicero, the village of Maywood, the city of Berwyn, the town of Proviso, the highway commissioner of the town of Proviso, the boards of education of school districts Nos. 88, 98, 99 and 100, the board of education of high school district No. 201, the Cicero Public Library, the Cicero Park District, the Clyde Park District, and the Hawthorne Park District, all in Cook county, praying for the issuance of a writ of *mandamus* commanding the board of assessors and the board of review of Cook county to complete the assessment for the year 1928, by using for that purpose the real estate valuations fixed in 1927 without change or revision and to certify the assessment so made to the county clerk; commanding the Tax Commission of the State to make its certificates of equalization and original assessments and to deliver them to the county clerk, and commanding the latter officer, upon such assessment and certificates, to extend the taxes levied by the various taxing bodies of the county, and to issue the appropriate warrants to the various tax collectors to the end that the taxes levied in Cook county for the year 1928 may be collected forthwith. The tax commission demurred to the petition and the other respondents answered it. The relators interposed a demurrer to the answer. Upon these pleadings the cause is submitted.

The petition contains the following allegations: The town of Cicero exists under a special charter. It has a population of approximately 80,000. Early in the year 1928 it appropriated $576,716.31. The village of Maywood was

organized under the general Cities and Villages act. Its population is 30,000. For the year 1928 it appropriated $289,400. The city of Berwyn also exists under the general Cities and Villages act. It has a population of 62,000. In 1928 it appropriated and levied taxes in the sum of $239,894.31. The city was compelled to anticipate the taxes so levied and warrants to the extent of seventy-five per cent of the levy have been issued. In 1928 the town of Proviso levied $5900 for town purposes, and the highway commissioner of the same town levied $25,000 for highway purposes. School districts Nos. 88, 98, 99 and 100, and high school district No. 201, all in Cook county, were organized and exist under the school laws of the State and each is governed by a board of education. In the year 1928 taxes were levied by these districts as follows: No. 88, $91,-190.85; No. 98, for educational purposes, $112,500, and for building purposes, $37,500; No. 99, for educational purposes, $487,500, and for building purposes, $162,500; No. 100, $210,000 for educational purposes, and $65,000 for building purposes, and high school district No. 201, $750,000 for educational purposes, and $250,000 for building purposes. Each of these school districts, subsequent to its levy of taxes, sold anticipation warrants to the extent of seventy-five per cent of the levy. To prevent defaults in the payment of maturing bonds and the interest thereon district No. 99 paid $49,000 in principal and $40,-788.25 as interest, and high school district No. 201 paid $74,750 in principal and $61,653.75 as interest out of funds derived from the sale of tax anticipation warrants. In the year 1929, each of these districts made a further tax levy and again anticipated collection by the issuance and sale of warrants to the extent of seventy-five per cent of the levy. The tax levy of the Cicero Public Library for the year 1928 was included in the tax levy of the town of Cicero. In the same year the Cicero Park District, the Clyde Park District and the Hawthorne Park District lev-

ied taxes for ordinary purposes and to retire bonded indebtednesses. The necessary steps to levy the respective taxes were taken by each of the foregoing tax levying bodies and in each instance the requisite certificate or certified copy of the levy or of the ordinance levying the taxes was filed with the county clerk within the time prescribed by the governing statutes.

It further appears from the petition that early in 1927 books in proper form for the making of the quadrennial assessment in that year were provided; the various parcels of land in the county were assessed and the books were returned to the board of assessors; that the board of assessors revised the assessments and delivered the books to the board of review; that the books were further revised by the latter board and were certified and delivered to the county clerk; that abstracts of the books were sent to the tax commission, the values fixed were equalized by the commission and the appropriate certificates were issued to the county clerk, and that thereafter the latter extended the levies of the various taxing bodies of the county upon the quadrennial assessment so made, warrants were delivered to the various collectors and the taxes for 1927 were collected and paid to the treasurers of the various municipalities in the proportions to which they were entitled thereto.

The relators further allege that on July 10, 1928, the tax commission found that gross inequalities existed in the 1927 quadrennial assessment of real property in Cook county, and, that because of such inequalities and the non-publication of the assessment, a re-assessment of all the real estate in the county was both desirable and necessary; that the commission thereupon ordered "that the local assessing officers within and for the county of Cook proceed forthwith to re-assess all real property within the said county of Cook assessed in the year 1927, and that when such assessment is made that it be substituted for the said

original quadrennial assessment of real property made in 1927 for the year 1928 and thereafter until the next quadrennial assessment is made;" that a copy of the order was filed with the board of review of Cook county on July 19, 1928; that at the time the order was entered, the boards of assessors and review were engaged in revising and reviewing the quadrennial assessment of 1927 as modified by dedications, the vacation of subdivisions, the creation of new subdivisions, the addition or removal of improvements and other changes; that upon the entry of the tax commission's order these boards suspended the work in which they were engaged and proceeded to make the re-assessment; that on August 2, 1928, the tax commission amended its rules by adding Rule 14, which provided for the making of a comprehensive assessment of real estate; that on May 4, 1929, the commission, by a further amendment of its rules elaborated upon the method of assessment and review by the respective local boards and prescribed forms of complaint to be made before those boards by aggrieved tax-payers, and that the requirements of these amended rules have delayed the completion of the re-assessment.

It is alleged in the petition that in consequence of the tax commission's order of July 10, 1928, no taxes were extended in Cook county in 1928 or collected in 1929; that most of the taxing bodies in Cook county were compelled to exercise their statutory right to anticipate seventy-five per cent of the taxes levied by them in 1928 which right was necessarily measured by the assessment of 1927; that many of these bodies have also anticipated their 1929 tax levies but financial institutions which bought tax anticipation warrants in large numbers refuse to buy more; that the municipalities in Cook county are in great financial distress and that municipal government is consequently crippled.

The petition concludes with the allegations that the annual personal property assessment was made and reviewed

in Cook county in the year 1928; that in the same year the tax commission issued its certificates of equalization and original assessments to the clerks of the several counties, except the county of Cook; that the requisite data to prepare these certificates for Cook county are in the possession of the commission, and the certificates can be issued to the county clerk without delay; that a complete duplicate set of the books showing the quadrennial assessment of real property made in 1927 still exists; that the county clerk will be able to extend the taxes levied by the various taxing bodies in the year 1928 upon the personal property assessment of that year and the 1927 quadrennial assessment of real property and have the warrants ready for delivery to the various collectors within a very short time; that demand has been made upon the board of assessors, the board of review, the tax commission and the county clerk so to complete the assessment for the year 1928, and to extend thereon the taxes levied in the same year, but that compliance with the demand has been refused.

The board of assessors, the board of review and the county clerk by their answer deny that the quadrennial assessment of 1927 or a duplicate of that assessment now exists or that it can be placed in the hands of the county clerk for his use in the extension of taxes. The respondents aver in their answer that: The form for the quadrennial assessment contains one column horizontally lined for legal descriptions. To the right of this column are headings and columns for valuations of lands and improvements as made by the boards of assessors and review respectively for each of the four years of the quadrennial period. Changes in descriptions from year to year must, however, be made in the single column at the left of the form. Such changes are rendered necessary by vacations, dedications, consolidations, new subdivisions, new or expired exemptions, new improvements, changes by fire and flood, and errors in description, among others, happening after the first day of April of

the preceding assessment year, and aggregate approximately · 125,000 annually.

Further averments of the answer are: All changes in descriptions for the year 1928 have been made in the single column provided for descriptions in the quadrennial form, and the valuations of the re-assessment to the extent of 1,843,500 lines have been entered in the 1928 columns of the same form. The valuations already entered constitute considerably more than one-half of the entire re-assessment. The entries have been made in triplicate, and when completed the re-assessment will stand upon the descriptions of 1927, as changed in the same column for 1928 and upon the valuations appearing in the columns for the latter year. Because of the changes made the quadrennial assessment of 1927 is no longer in existence and to provide new assessment books for the current quadrennial period will require five months and an expenditure of $525,000.

It is further averred in the answer that over 61,000 complaints by tax-payers against the quadrennial assessment of real property, as modified for the year 1928, had been filed with the board of review when the re-assessment was ordered by the tax commission; that these complaints are still on file and no hearing has been had on any of them; that before the warrants for the year 1928 could be delivered to the county clerk, hearings would have to be held on the complaints so filed, and that as an additional reason why the quadrennial assessment of 1927 is not available, more than 30,000 changes in the valuations of that assessment have been made pursuant to orders of the courts of Cook county.

The answer concludes with the following averments: The re-assessment of real property in Cook county as directed by the tax commission has been completed by the board of assessors, and comprises 579 books. Of these 281 have been revised and delivered to the board of review. Complaints, 6221 in number, have been filed against

valuations contained in 222 of the books so delivered and disposition has been made of practically all of them. Complaints are now being received with respect to the valuations shown by the remaining 59 books in the hands of the board of review. The valuations contained in the 298 books not yet delivered to the board of review are undergoing revision by the board of assessors. The revision is made by towns and as soon as the books showing the valuations for a town are revised, the books are immediately transmitted to the board of review. The respondents who answer submit, in view of the facts they aver, that the relators are not entitled to a writ of *mandamus*.

To sustain the prayer of their petition, the relators contend that the provision of the statute that a re-assessment shall be made in the same manner and subject to the same laws as an original assessment necessarily means that the assessors shall make the re-assessment during the months of May and June, that the board of assessors shall revise the individual assessments in June, and that the board of review shall make its revision between the third Monday of June and the seventh day of September, when the delivery of the assessment books to the county clerk is required; that the quadrennial assessment of 1927 must remain in effect to protect municipal obligations and the machinery for the development of public revenues must operate upon that assessment until a new one is actually substituted therefor; that the order of the tax commission could not be effective to delay the extension and collection of taxes to discharge such indebtednesses; that to give the order the effect of prohibiting the extension and collection of taxes on the existing quadrennial valuations would impair the obligations of contracts and violate the constitutional provision which requires a municipal corporation, at or prior to the time of incurring an indebtedness, to provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due and also to pay and

discharge the principal within twenty years from the time of contracting it; that the tax commission had no power in the middle of the year to interfere with the orderly program for the levy and extension of taxes by creating a situation which would greatly delay the collection of municipal revenues and in consequence disturb the orderly functions of local governments; that the commission's order could only be effective if the re-assessment were made and filed with the county clerk on or prior to September 7, 1928, and that the order to substitute the re-assessment became inoperative and void after that day and thereupon it became the county clerk's duty to extend the taxes for 1928 upon the quadrennial assessment of 1927, as it then existed.

Section 9 of the Revenue act of 1898 (Cahill's Stat. 1929, p. 2203; Smith's Stat. 1929, p. 2415) provides that all real property subject to taxation under the general revenue laws of the State, including real estate becoming taxable for the first time, shall be listed in the name of the owner and assessed for the year 1899, and every fourth year thereafter, and also in any year in which the tax commission orders a re-assessment to the extent ordered, with reference to the quantity owned on the first day of April of the year in which the property is assessed, including all property purchased on that day; that this assessment shall be known as the general assessment, and as modified, equalized or changed as provided by law, shall be the assessment upon which taxes shall be levied and extended during the quadrennial period for which it is made or the remainder of such period as to the property re-assessed by order of the tax commission, except where acreage property has been subdivided into lots and the subdivision has been recorded in the recorder's office or filed in the registrar's office, as the case may be, the lots shall be re-assessed and placed upon the assessor's books in lieu of the acreage property as of the first day of April immediately following the date of such recording or filing. By section 10 it is provided

that the county clerk shall before April 1, 1907, and every four years thereafter, make a list of lands and lots to be assessed for taxes in the manner provided by the general revenue law, and that he shall also annually, before the first day of April, make a list of lands and lots which are taxable and are not listed or which become taxable for the first time as well as of lands and lots which have been subdivided and are not listed by the proper description. Section 12 provides that the assessor shall, before June 1, 1899, and every fourth year thereafter, in person or by his deputy, actually view and determine as near as practicable the value of each tract or lot of land listed for taxation as of the first day of April of that year, and assess it at the value required by law, save that in the case of acreage property which has been subdivided into lots, there shall be a revaluation on the first day of April immediately following the date of the recording or filing of the subdivision; that in making such assessments he shall set down his valuation of improved tracts and lots in one column, and of unimproved tracts and lots in another column; that he shall, also, between the first days of April and June in each intervening year, list and assess in like manner all real property which shall become taxable and is not upon the general assessment, and, in addition, make and return a list of all added improvements, the value of which was not included in the valuation of the land so improved, specifying the tract or lot on which each improvement has been erected or placed, the kind of improvement and the value which, in his opinion, has been added to such tract or lot, and in case of the destruction or damage by fire, flood, cyclone, storm or otherwise, or of the removal of any structure, or of the destruction of or damage to any orchard, timber, ornamental trees or groves, the value of which was included in the valuation of the tract or lot on which the same stood, the assessor shall determine as near as practicable how much the value of such tract or lot has been reduced thereby and

make return of such change. By section 13 it is provided that all such lists, valuations and entries shall, in counties of 250,000 inhabitants or over, be made in triplicate assessment books, and in all other counties, in duplicate books; that the assessor shall, from time to time, make such alterations in the descriptions of real property, as he may find necessary; that when such property has been subdivided since the general assessment, he shall make the description correspond to the subdivision and distribute the assessment in the proper proportions among the lots or parcels into which the land has been subdivided, and that in case of the vacation of a subdivision, he shall re-adjust the description of the assessment accordingly. Section 14 provides that on or before the first day of June in each year, other than the year of the quadrennial assessment, the assessor shall determine the amount, in his opinion, of any change in the value of any tracts or lots of land by reason of any damage to, alteration in or addition to, the improvements thereon, since the first day of April in the preceding year and prior to the first of April in the current year, and add to or deduct from the assessment accordingly, setting down the amount of such change in a proper column in the assessment books. Section 23 provides that in counties having a board of assessors the board shall meet annually on the first Monday in June for the purpose of revising the assessment of real property, and on the third Monday in June to revise the assessment of personal property, and that at such a meeting the board of assessors, upon application of any tax-payer, or upon its own motion, shall revise the assessment and correct it as shall appear to be just. By section 34 it is provided that the board of review shall meet on or before the third Monday of June in each year for the purpose of revising the assessment of property; that at such meeting the board upon application of any tax-payer or upon its own motion, may revise the whole or any part of a tax-payer's assessment and correct

it as shall appear to be just, but that in no case shall the assessment of any person's property be increased unless he or his agent, if either resides or has a place of business in the county, first shall have been notified in writing and been given an opportunity to be heard, and that such meeting may be adjourned from day to day as may be necessary save, that the final adjournment of the board of review shall be on or before the seventh day of September. The term "quadrennial assessment," as used in the act, section 35 provides, shall be taken to mean the general assessment of real estate and improvements required by law to be made once in four years.

From the foregoing statement of the substance of the pertinent provisions of sections 9, 10, 12, 13, 14, 23, 34 and 35 of the Revenue act of 1898, it is apparent that the general or quadrennial assessment of real property as completed in the first year of the quadrennium is not the assessment upon which taxes shall be levied and extended during the ensuing three years of the period. It is the general assessment as modified, equalized or changed as provided by law which, section 9 declares, shall be the assessment upon which taxes shall be levied and extended during the quadrennial period for which it is made or the remainder of that period as to the real property re-assessed by order of the tax commission. The Revenue act makes provision for modifications of the general assessment in each successive year to meet changed conditions. The county clerk is required, before the first day of April in each year, to make a list of the lands and lots omitted from the general assessment or which become taxable for the first time; and it is made the duty of the assessor to assess such lands and lots between the first days of April and June in each intervening year. The assessor is commanded to make the necessary alterations in the descriptions of real property and in case of the creation or vacation of subdivisions since the general assessment to change or re-adjust the descrip-

tions accordingly. The subdivision of lands into lots imposes upon the assessor the duty of assessing the lots instead of the land as of the first day of April following the recording or filing of the plat of the subdivision. The assessor is required between the first days of April and June in each intervening year to determine the changes in the values of lots or tracts of land caused by the addition, or the damage, destruction or removal of improvements between the first days of April of the preceding and current years and to increase or reduce the particular assessments in accordance with such changes. For the purpose of revising the assessment of real property, the board of assessors is required to meet on the first Monday of June in each year. The board of review, it is provided, shall meet annually on or before the third Monday of the same month to revise the assessment of property and in no case shall any person's assessment be increased without notice and an opportunity to be heard.

Section 1 of article 9 of the constitution requires the General Assembly to "provide such revenue as may be needful by levying a tax, by valuation, so that every person and corporation shall pay a tax in proportion to the value of his, her or its property—such value to be ascertained by some person or persons, to be elected or appointed in such manner as the General Assembly shall direct, and not otherwise." Every person has the right under the constitution to have his property so assessed that it shall not bear more than its proportionate share of the burden of taxation. Substantial changes in the condition of a parcel of land, such, for example, as the erection of a new building thereon or the removal of an existing building therefrom may materially affect the value of the land. It is conceded that a considerable number of such changes occur in Cook county each year. Unless the Revenue act of 1898 made provision for the modification of the general assessment because of such changes, it is obvious that there could be no taxa-

tion in proportion to the value of property as enjoined by the constitution.

By the exercise of the taxing power private property is appropriated. Every person has the right to be heard before he can be justly deprived of his property. He has the right to be informed of the value placed upon it by the assessor, in order that he may, if aggrieved, appeal to the board which has the power to revise and correct the assessment. (*City of Nashville* v. *Weiser,* 54 Ill. 245.) To levy taxes upon the general assessment throughout the quadrennium without giving the tax-payer an opportunity to be heard concerning substantial changes in the condition and consequently in the value of his property would not only result in a disproportionate assessment but would also deprive him of his property without due process of law.

The relators assert, however, that the taxes levied in 1928 may be extended upon the quadrennial assessment of 1927 because the tax-payer is afforded the opportunity to urge objections to the assessment upon his property when the county collector applies to the county court for judgment and order of sale and that the requirement of due process of law is satisfied by this proceeding. The contention not only ignores the various provisions of the Revenue act of 1898 which insure the tax-payer an opportunity to be heard before the assessment upon his property is finally certified by the board of review, but it also assumes, notwithstanding the relators, by their demurrer to the answer, admit the contrary, that the quadrennial assessment still exists and is available for the extension of taxes for the year 1928. Section 12 of an act in relation to the assessment of property for taxation, approved June 19, 1919, as amended, (Cahill's Stat. 1929, p. 2172; Smith's Stat. 1929, pp. 2431, 2432) provides, among other things: "Whenever it shall appear to the tax commission that the real or personal property in any county, or in any assessment district thereof, has not been assessed in substantial compliance

with law, or has been unequally or improperly assessed, the tax commission may, in its discretion, in any year, whether after or before the original assessment is completed by the local assessment officers, order a re-assessment for such year of all or any class of the taxable property in such county, or assessment district thereof; and such re-assessment shall be substituted for the original assessment. The tax commission may order such re-assessment made by the local assessment officers. * * * If any general or quadrennial assessment of real property shall not be published in any year for which such assessment was made, or if such publication was not made in time to permit the examination thereof by the tax commission in such year, then the tax commission may in any of the three years intervening between the years for which general quadrennial assessments are made order such re-assessment of such then last general quadrennial assessment of all or any class of real property in such county or assessment district, and such re-assessment shall be substituted for such original general quadrennial assessment for such intervening year and thereafter until the next general quadrennial assessment is made. No substitute assessment shall invalidate any prior assessment as to taxes extended thereon * * *." Pursuant to authority so conferred, the tax commission, having determined that gross inequalities existed in the quadrennial assessment of 1927 and that the assessment had not been published, on July 10, 1928, ordered the assessing officers of Cook county forthwith to make a re-assessment of all real property in the county. Section 9 of the Revenue act of 1898 requires all real property subject to taxation under the general revenue laws of the State to be assessed for the year 1899 and every fourth year thereafter, "and also in any year in which the tax commission orders a re-assessment." Section 12 of the act of June 19, 1919, as amended, expressly provides that when the tax commission orders a re-assessment, it shall be substituted for the

original assessment. The commission's order was authorized by the statute. Upon its entry it became the duty of the local assessing officers to make the re-assessment and the general assessment of 1927 was therefore no longer available for the extension of the taxes levied in 1928. The quadrennial assessment having been superseded by the order of a competent authority, it is not within the power of the judiciary to restore that assessment and command the extension of taxes upon it. The power to impose burdens and to raise money is a legislative power, and can be exercised only by or under the authority of the legislature. (*Meriwether* v. *Garrett*, 102 U. S. 472; *Rees* v. *City of Watertown*, 86 id. 107; *People* v. *Millard*, 307 Ill. 556; *Burton Stock Car Co.* v. *Traeger*, 187 id. 9; *Keokuk Bridge Co.* v. *People*, 185 id. 276). The persons elected or appointed, pursuant to section 1 of article 9 of the constitution, to ascertain the value of property for purposes of taxation, are exclusively invested with that power and courts may not exercise it. It is only where a valuation has been fraudulently made that it is subject to judicial review. *Heidenway* v. *Harding*, 336 Ill. 606; *County of Cook* v. *Columbia Ins. Co.* 329 id. 189; *Keokuk Bridge Co.* v. *People, supra; Beidler* v. *Kochersperger*, 171 Ill. 563; *People* v. *Lots in Ashley*, 122 id. 297; *Ottawa Glass Co.* v. *McCaleb*, 81 id. 556; *Republic Life Ins. Co.* v. *Pollak*, 75 id. 292; *Spencer & Gardner* v. *People*, 68 id. 510.

The contention of the relators that the tax commission's order became ineffective because the re-assessment was not completed within the time limited for the making of an original assessment and hence that the quadrennial assessment should be revived is untenable. Section 12 of the act of June 19, 1919, as amended, by authority of which the commission acted, expressly provides that it "may, in its discretion, in any year whether after or before the original assessment is completed by the local assessment officers, order a re-assessment for such year of all or any class of

the taxable property in such county." Nor does delay in the completion of the re-assessment justify the substitution of the quadrennial assessment, for section 40 of the Revenue act of 1898 provides that a failure to complete an assessment when required shall not vitiate it, but that it shall be as legal and valid as if completed within the time prescribed by law.

The constitution requires a municipal corporation incurring an indebtedness to provide for the collection of a direct annual tax sufficient to pay the interest as it falls due and to discharge the principal within twenty years, and the relators insist that a law which, by authorizing a reassessment of property, delays the annual collection of taxes, violates the .fundamental law. The duty to provide for the collection of an annual tax to discharge a municipal indebtedness is enjoined upon the municipality. That duty, obviously resting upon an obligor, has been performed, it appears, by each of the relators which has an outstanding indebtedness. The act which authorizes a re-assessment provides that it shall be made for a particular year and that it shall be substituted for the original assessment. The omission of an annual tax levy is neither contemplated nor permitted by the act and mere delay in the extension of a tax cannot have that effect.

From the pleadings it appears that the board of assessors has completed the re-assessment and revised substantially one-half of it; that much progress in revision has been made by the board of review; that the re-assessment will shortly be completed, and that to restore the quadrennial assessment would require five months and an expenditure of $525,000. To order the extension of the taxes levied in 1928 upon the quadrennial assessment of 1927, under these circumstances, even if it were legally possible, would serve no useful purpose. The writ of *mandamus* is not granted as a matter of absolute right and it will be denied where it will not have a beneficial effect.

*Kenneally* v. *City of Chicago,* 220 Ill. 485; *Illinois Watch Case Co.* v. *Pearson,* 140 id. 423; *Cristman* v. *Peck,* 90 id. 150; *People* v. *Lieb,* 85 id. 484.

The prayer of the petition for a writ of *mandamus* is denied.

*Writ denied.*